UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JERRY W. MULLINS** | * | |
| **Plaintiff** | * | |
| **v.** | * | **Civil Action No.: 16-cv-1113-PX** |
| | | (*consolidated with PX-16-1114*) |
| **THE UNION MEMORIAL HOSPITAL INC., d/b/a MedStar Union Memorial Hospital** | * | |
| | * | |

*   *   *   *   *   *   *

## DEFENDANT MEDSTAR UNION MEMORIAL HOSPITAL'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, MedStar Union Memorial Hospital, by and through counsel, Daniel C. Costello, Esq., and Michelle R. Mitchell, Esq. of Wharton Levin Ehrmantraut & Klein, PA, and pursuant to the United States District Court for the District of Maryland Rules of Civil Procedure, Federal Rule 56, files this Motion for Summary Judgment, and in support thereof states as follows:

1.     Plaintiff alleges that this Defendant violated the provisions of the Emergency Medical Treatment and Active Labor Act, codified at 42 U.S.C. 1395dd(a)("EMTALA").

2.     Defendant maintains that EMTALA is inapplicable to this case for several reasons:

3.     First, Mr. Mullins was stabilized in the Emergency Department of Suburban Hospital at the time the transfer request to this Defendant was made.  EMTALA provisions regulate the management (and transfer) of unstabilized patients.   Accordingly, EMTALA does not apply as a matter of law.

1

4.      Second, Defendant Union Memorial Hospital did not (and does not) possess "specialized capabilities" relative to Suburban Hospital (where Mr. Mullins was treated).  To the contrary, it is undisputed that Suburban Hospital had both orthopedic surgeons and hand specialists on staff and on-call on the date Mr. Mullins was treated.

5.      Third, Plaintiff has failed to establish that Union Memorial Hospital had the capacity to treat Mr. Mullins on the day in question.

6.      Fourth, Defendant Union Memorial Hospital did not decline Mr. Mullins as a patient; rather, it offered to consult on Mr. Mullins care, but was never called back regarding the patient.

WHEREFORE, for the aforementioned reasons, and the reasons set forth more fully in the accompanying Memorandum of Points and Authorities, which is incorporated fully herein by reference, Defendant MedStar Union Memorial Hospital respectfully requests that this Honorable Court grant Defendant's Motion for Summary Judgment.

Respectfully submitted,


_____*Michelle R. Mitchell*_____
 Daniel C. Costello, Esquire
Maryland Federal Bar No.: 08010
*dcc@wlekn.com*
Michelle R. Mitchell, Esquire
Maryland Federal Bar No.: 26703
*mrm@wlekn.com*
Wharton, Levin, Ehrmantraut & Klein, P.A.
104 West Street
Annapolis, MD 21404-0551
(410) 263-5900 (ph)
(410) 280-2230 (fax)
*Counsel for Defendant*
*The Union Memorial Hospital, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th day of March, 2018 the foregoing was served, electronically and via first class mail, postage prepaid, upon:

Jerry W. Mullins
7031 Southerland Circle
Salem, VA 24153
*Pro se Plaintiff*

  /s/ Michelle R. Mitchell
Michelle R. Mitchell, Esquire

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JERRY W. MULLINS | * | |
| Plaintiff | * | |
| v. | * | Civil Action No.: 16-cv-1113-PX |
| | | (*consolidated with PX-16-1114*) |
| THE UNION MEMORIAL HOSPITAL INC., d/b/a MedStar Union Memorial Hospital, et. al. | * | |
| | * | |
| Defendants | * | |

\* \* \* \* \* \* \*

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant MedStar Union Memorial Hospital, by and through counsel, Daniel C. Costello, Esq., and Michelle R. Mitchell, Esq., of Wharton Levin Ehrmantraut & Klein, PA., by and through undersigned counsel and in support of this Motion for Summary Judgment, files this Memorandum of Points and Authorities.

## I.    FACTUAL BACKGROUND

### A. Summary of Allegations

Plaintiff Jerry W. Mullins brings this action claiming a violation of The Emergency Medical Treatment and Active Labor Act ("EMTALA") by MedStar Union Memorial Hospital ("Union Memorial"). *See* Exhibit 1.   This case arises from care and treatment that took place at Suburban Hospital ("Suburban") on April 15, 2014. *Id.*   Mr. Mullins claims that when the Suburban Emergency Department ("ED") providers contacted Union Memorial to inquire about transferring Mr. Mullins to their care, Union Memorial was 'obligated' to immediately accept the

1

transfer.   Defendant denies that it was obligated to blindly accept the transfer request per

EMTALA, particularly given that (a) Mr. Mullins was stabilized in the ED; (b) Suburban

Hospital possessed the same specialty services (hand specialists) on site, and (c) Plaintiff

adduced zero evidence that Union Memorial had the capacity to treat Mr. Mullins at the time of

the request.   Defendant further maintains that Union Memorial did not deny the transfer; rather,

Union Memorial merely requested that Suburban have its own on-call orthopedic specialist

assess Plaintiff and then contact Union Memorial to discuss his case when more information was

known about his condition and needs.   For any one of these reasons, EMTALA is not applicable

to the case at hand and Defendant is entitled to summary judgment as matter of law.

### B.  Statement of Undisputed Facts

1.  <u>Undisputed Facts Regarding Mr. Mullin's Treatment at Suburban</u>

In the early afternoon on April 15, 2014, Plaintiff sustained an injury to his finger on his

right hand and was transported by ambulance to Suburban Hospital. *See* Exhibit 2 (Plaintiff's

Response to Requests for Admission).   Plaintiff was examined by a Physician's Assistant as

well as an Emergency Department physician at Suburban Hospital on April 15, 2014. *See*

Exhibit 4 (Suburban medical records of Plaintiff).   Plaintiff's condition was stabilized in the

Emergency Department. [1]  *See* Exhibit 4, Exhibit 5 (Dr. Leonard Affidavit).   As a Level II

Trauma center in the State, Suburban Hospital has both orthopedic surgeons and hand specialists

on-call.  *See* Exhibit 7 (Dr. Elliott Affidavit), Exhibit 8 (Dr. Zimmerman Affidavit), and Exhibit

9 (Suburban On-Call Schedules).   Dr. Leonard, Suburban's Emergency Department physician,

contacted Dr. Feledy, the hand specialist who was on-call at Suburban Hospital, requesting a

consultation.  *See* Exhibit 4, Exhibit 5, Exhibit 6 (Dr. Feledy Affidavit), Exhibit 9.  Dr. Feledy

---

[1]  Dr. Leonard, Plaintiff's treating Emergency Department physician, confirmed that Mr. Mullins' finder was stable.
*See* Ex. 5, 12.

2

advised Dr. Leonard that he was busy in another case and could not see Plaintiff. *See* Exhibits 5 & 6.   Dr. Feledy made several suggestions to the ED providers, including contacting the second on-call hand specialist at Suburban (Dr. Michaels) or considering a transfer to Union Memorial. *Id.*   Dr. Leonard made calls to both Dr. Michaels and Union Memorial. *See* Exhibits 4 & 5.   Of note, Dr. Leonard also placed calls to Dr. Robert Karp and Dr. Mahidhar Durbhakula (both hand surgeons at Suburban Hospital) for potential hand surgery consultations. *Id.*

In the interim, Dr. Feledy also contacted the on-call orthopedic surgeon for Suburban, Dr. Gasho, and asked whether Dr. Gasho was available to evaluate Plaintiff in the Emergency Department. *See* Exhibit 6.   Dr. Gasho was available and agreed to proceed to the Emergency Department immediately. *Id.*   Thus, Dr. Feledy contacted the ED providers again, to advise that Dr. Gasho was *en route* to evaluate Mr. Mullins. *See* Exhibits 4, 5, & 6.   Subsequent to receiving this information, Dr. Leonard received a call back from Suburban's Chief of Hand Surgery, Dr. Karp; because Dr. Gasho was already *en route*, however, Dr. Leonard advised Dr. Karp that his services were not needed.   *See* Exhibits 4 & 5.

Dr. Gasho, the on-call orthopedic surgeon at Suburban Hospital, evaluated Plaintiff in the Emergency Room. *See* Exhibits 2, 3, & 4.   Dr. James Gasho determined that Mr. Mullins' hand injury would be best addressed by a surgical procedure, which he advised the patient he could perform later that day. *See* Exhibit 2.   Dr. Gasho advised Mr. Mullins of the nature of the surgical procedure, and its risks, benefits and alternatives, and Mr. Mullins consented to proceed with the surgery proposed by Dr. Gasho. *See* Exhibit 2 & 3.   At no point in time did Mr. Mullins request a second opinion regarding his finger by another orthopedic surgeon or a hand specialist. *See* Exhibit 3.   Plaintiff was taken to surgery at 6:48 p.m. on April 15, 2014. *See* Exhibit 2 & 4.[2]

---

[2]   Plaintiff filed a medical malpractice lawsuit in State court as a result of the surgery performed by Dr. Gasho.

2.  Undisputed Facts Regarding the Call to Union Memorial Hospital.

As stated above, when Dr. Feledy first advised the ED personnel that he could not consult on Mr. Mullins, one of his suggestions was to call Union Memorial Hospital to see if they could accept the transfer of the patient. *See* Exhibit 5 & 6.  The ED personnel contacted Union Memorial Hospital and spoke with the on-call Fellow, Dr. Elliott. *See* Exhibit 7.  Dr. Elliott was advised that a patient with a lacerated finger had presented to the ED at Suburban, the patient's finger was stable, in that it had good sensation and perfusion, but the on-call hand specialist at Suburban was currently tied up with another patient (and thus, Suburban sought consideration for transfer to Union). *See* Exhibit 7.  Dr. Elliott discussed the transfer request with the attending on-call physician at Union, Dr. Zimmerman. *See* Exhibit 7 & 8.  Dr. Zimmerman, aware of Suburban's status as a Level II trauma facility, asked whether the patient had been seen by either an orthopedic or hand specialist at Suburban, and if so, which physician evaluated the patient and what was his/her diagnosis for Mr. Mullins. *See* Exhibit 7, 8.   Dr. Zimmerman learned that Suburban had not yet had their patient evaluated by their own specialists yet, and requested that Suburban have its own on-call orthopedic surgeon promptly evaluate the patient, after which time, he should/ could consult with the Curtis National Hand and an educated decision could be made about feasible treatment alternatives for Mr. Mullins, including but not limited to a telephonic consultation, discharge from Suburban with a clinic appointment at Curtis the following day, consultation regarding conducting a definitive procedure at Suburban and/or transfer to Union Memorial's Curtis Hand Center.[3] *See* Exhibit 2, 7, 8.

---

[3] An evaluation by a provider with some specialization in orthopedic / hand was necessary so that the patient's condition and treatment options could be discussed in a more comprehensive manner, and the best decision made for the patient.  While adept at assessing a patient's needs generally, ED physicians defer to specialists as to the optimal course for a patient suffering an orthopedic injury, just as Dr. Leonard readily acknowledged. *See* Exhibit 12 (Dr. Leonard deposition excerpts).

4

Dr. Elliott immediately called Dr. Leonard back, and advised that once an orthopedic or hand specialist at Suburban assessed Mr. Mullin's case, to contact Union Memorial back for consultation to discuss his status and determine the appropriate course of care. *See* Exhibit 7. Per Union Memorial Hospital's contemporaneous call logs, the incoming call regarding Mr. Mullins was categorized as a "consult." *See* Exhibit 8, Exhibit 11 (Union Memorial / Ken Walsch Affidavit). The contemporaneous logs do <u>not</u> reflect that Mr. Mullins' "transfer request" was declined. *Id.* In fact, Union Memorial Hospital's corporate designee confirmed that Union Memorial did not decline Mr. Mullins' request for transfer, and further, that the only time a transfer request was declined in the entire month of April 2014 was relating to an infant because Union did not have pediatric capabilities. *See* Exhibit 11. Despite Dr. Elliott's offer to consult, neither Dr. Gasho nor any other provider at Suburban contacted Union Memorial again regarding Mr. Mullins' case. *See* Exhibit 7, 8.

Of note, both Dr. Zimmerman and Dr. Elliott, the on-call attending physician and Fellow at Union Memorial, were tied up in the operating room for several hours on April 15, 2014 addressing a multi-digit amputation case, which would have been triaged as a higher acuity than Mr. Mullins case and delayed any treatment options for Mr. Mullins significantly. [4]

Defendants contend that there are no facts that render the EMTALA claims applicable to this matter, and thus judgment in favor of Defendant is warranted as a matter of law.

---

[4]   Dr. Zimmerman explained that this situation confirms the importance of having Level II facilities (like Suburban) utilize their own internal resources to evaluate patients before decisions are made regarding patient care. *See* Exhibit 8.   Union Memorial Hospital's Curtis National Hand Center frequently receives complex emergency cases (like multi-digit amputations) from facilities without any specialists on staff. "As such, it is important that Level II facilities provide prompt orthopedic evaluations of their patients so that informed discussions can be had regarding the best treatment options for the patient, in light of available resources either at Curtis or the requesting institution." *See* Exhibit 8.   If Union would blindly accept all requests for transfers, even from facilities with their own specialists on site, it would severely tax Union's limited resources, and its ability to fulfill its obligation as a state-designated referral center for hand injuries (i.e. for rural institutions without specialty care).

## II.    LEGAL ARGUMENT

### A.  Standard of Review

Federal Rule 56 provides that "the judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2).   Essentially, the moving party is 'entitled to judgment as a matter of law' when the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Baber v. Hospital Corp. of America,* 977 F.2d 872, 874 (4th Cir. 1992) (affirming summary judgment in defendant's favor on an EMTALA claim); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In a summary judgment proceeding, the moving party must demonstrate the absence of a genuine issue of material fact.   *See Baber*, 977 F.2d at 873.   A genuine issue as to a material fact exists if the evidence that the parties present to the court is sufficient to indicate the existence of a factual dispute that could be resolved in the non-moving party's favor through trial.   *See Anderson*, *Anderson v. Liberty Lobby,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).   Once the moving party has shown the absence of a genuine issue of material fact, *Pulliam Investment Co., Inc. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987), it is the non-moving party's burden to establish its existence. *See Baber,* 977 F.2d at 875; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence that the non-moving party presents to this end must be more than a "mere scintilla," *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984), more than "merely colorable," *Celotex*, 477 U.S. at 327, and more than "some metaphysical doubt."

*Matsushita*, 475 U.S. at 586.  In order for the non-moving party to survive summary judgment, it must present evidence that is "significantly probative." *Celotex*, 477 U.S. at 327.

Unlike the moving party, the "opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." *Id*. The opposing party must provide additional materials to successfully defend against summary judgment and those materials must include assurances to the Court that they are authentic and reliable.

A court's summary judgment inquiry "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).   The Rule 56 requirements for summary judgment "help assure the fair and prompt disposition of cases." *Orsi v. Kirkwood*, 999 F.2d 86, 91 (4th Cir.1993). "They also allow a district court to ascertain, through criteria designed to ensure reliability and veracity, that a party has real proof of a claim before proceeding to trial." *Id*.

### B.  THE HISTORY AND REQUIREMENTS OF EMTALA

In 1986, Congress enacted the Emergency Medical Treatment & Active Labor Act (EMTALA) to ensure public access to emergency services regardless of ability to pay.  *See* 42 U.S.C. § 1395dd*; see generally Baber v. Hospital Corp. of America,* 977 F.2d 872, 874 (4th Cir. 1992).  The EMTALA provisions were enacted to address a growing concern to prevent 'patient dumping,' which is defined as the practice of refusing to provide emergency medical treatment *to patients unable to pay*, or transferring them *before emergency conditions were stabilized*." *See Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir. 1994)(emphasis added).  "The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or

even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients."   *Baber*, 977 F.2d at 880.

Accordingly, EMTALA imposes two principal obligations on hospitals.  First, it requires that when an individual seeks treatment at a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination…to determine whether or not an emergency medical condition" exists.  *See* 42 U.S.C. § 1395dd(a).  Second, if the screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must "stabilize the medical condition" before transferring or discharging the patients.  *See* 42 U.S.C. § 1395dd(b)(1); *see also Vickers v. Nash General Hospital, Inc.,* 78 F.3d 139, 142  (4th Cir. 1996); *Brooks v. Maryland General Hospital*, 996 F.2d 708, 710 (4th Cir. 1993)(stating that EMTALA imposes two duties upon hospital's with emergency departments: (1) to screen; and (2) to stabilize).  The EMTALA statute is otherwise referred to as the "anti-dumping" statute, as its goal was to prevent hospitals from "dumping" indigent patients with unstabilized emergency medical conditions on other facilities due to their financial limitations.

Federal courts have routinely noted that EMTALA is an "anti-dumping" statute and is **not** a federal **malpractice** statute. *See e.g., Bryan v. Rector & Visitors of Univ. of Va.,* 95 F.3d 349, 351(4th Cir.1996).   The Act does not impose any duty on a hospital requiring that the screening result in a correct diagnosis.   *See id*.  Rather, Congress deliberately left the establishment of malpractice liability to state law, limiting EMTALA's role <u>to imposing on a hospital's emergency room</u> the duty to **screen** all patients as any paying patient would be screened and to **stabilize** any emergency condition discovered.  *Baber,* 977 F.2d at 879; *see also Brooks,* 996 F.2d at 711; *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991).  "Questions regarding whether a physician or other hospital personnel failed

properly to diagnose or treat a patient's condition are best resolved under existing and developing

state negligence and medical malpractice theories of recovery." *See Baber*, 977 F.2d at 880.

### C. EMTALA IS INAPPLICABLE TO THE FACTUAL CIRCUMSTANCES IN THIS CASE

Plaintiff contends that Defendant Union Memorial Hospital violated EMTALA in failing

immediately accept the transfer of Plaintiff from Suburban to its facility.  The Plaintiff's reliance

on EMTALA is entirely unfounded against this Defendant for several reasons.

### 1.  EMTALA is Inapplicable Given that Plaintiff Was Stabilized in the Emergency Department at Suburban Hospital.

The crux of EMTALA's provisions applies to the Emergency Departments at various

hospitals, to (a) screen patients for emergency medical conditions and (b) stabilize the patient.

As outlined above, it is undisputed that Plaintiff was examined (or screened) by a Physician's

Assistant as well as an Emergency Room physician at Suburban Hospital on April 15, 2014.  It is

also undisputed that Plaintiff's injury was stabilized in the Emergency Department.  Once a

patient is screened and stabilized, EMTALA no longer applies to the conduct of Suburban

Hospital – and certainly does not impose any duty on Union Memorial Hospital (one of several

specialty hand centers in the Baltimore metropolitan area) to accept the transfer of Mr. Mullins.

In response to a comment regarding the application of EMTALA, the Department of

Health & Human Service's Health Care Finance Administration stated that "the Act does not

impose any requirements on hospitals with respect to the treatment or transfer of individuals

whose emergency condition has been stabilized." *See* 59 Fed.Reg. 32105 (1994).   Put simply,

EMTALA does not regulate the transfer of stabilized individuals.  *Id.  See also* 59 Fed.Reg.

32104 (1994).  Instead, EMTALA provisions restrict the transfer of unstabilized patients (unless

certain conditions are met).   This is in keeping with the statute's purpose to ensure that patient's

with emergency medical conditions are not "dumped" on other facilities.  Once the patient's

9

condition is stable, the hospital owes no other duties to the patient under EMTALA.  *See* LARRY WEISS, M.D., "Current status of the Patient Transfer Act (EMTALA) in the Fifth Circuit." 43 LOY.L.REV.263, 265, (Summer 1997).

The meaning of the word, "stabilize" has been assessed by several federal courts since initiation of EMTALA.  "Stabilize" does not mean to "alleviate completely plaintiff's emergency medical condition."  *See Booker v. Desert Hospital Corp.*, 947 F.2d 412, 415 (9th Cirt. 1991).  Rather, "stabilize," in the context of EMTALA, means that the patient's condition is such that "no material deterioration would occur during the transfer of the patient."  *Id.*

In *Bergwall v. MGH Health Services, Inc.,* 243 F.Supp.2d 364 (D. Md. 2002), this Court explained that the treating physicians "made a determination, based on what they judged to be a reasonable medical probability, that [the patient's] condition would not materially deteriorate during a transfer to WHC.  If the doctors were in error – if they deviated from a relevant standard of care as to their diagnosis or proposed treatment of the diagnosed condition – they may be subject to state causes of action for malpractice." [5]  *Id.* at 374.  Again, this conclusion was reached because stabilizing a patient does not mean treating the patient's emergency medical condition in full.  *See also St. Anthony v. U.S. Dept. of Health and Human Services*, 309 F.3d 680, 694 (10th Cir. 2002)("EMTALA's definition of stability does not share the same meaning as the medical term "stable condition" which "indicates that a patient's disease process has not changed precipitously or significantly."). Under EMTALA, a patient may be in a critical condition and still be considered 'stabilized' under the terms of the Act.  *Id.*

In *St. Anthony's Hospital*, the Tenth Circuit analyzed the "reverse dumping" or "nondiscrimination duty" under EMTALA,[6] pointing out that the Department of Health and

---

[5]   Again, Mr. Mullins is simultaneously pursuing causes of action for medical malpractice in State court.
[6]   The "nondiscrimination" or "reverse dumping" provision is found at 42 USC 1395dd(g).  It states:

Human Services ruled that the "nondiscrimination duty is triggered only when the individual to be transferred suffers from an emergency medical condition *that has not been stabilized*." *St. Anthony's Hospital*. 309 F.3d at 694 (emphasis added)(citing Medicare Program; Participation in CHAMPUS and CHAMPVA, Hospital Admissions for Veterans, Discharge Rights Notice, and Hospital Responsibility for Emergency Care,  59 Fed.Reg. 32,086, 32,105 (June 22, 1994) ("The recipient hospital with specialized capabilities or facilities has an obligation under [§ 1395dd(g) ] to accept a transfer if the individual has an unstabilized emergency medical condition and if the hospital has the capacity to treat the individual." (emphasis added)).   The Court affirmed that "1395dd(g)'s nondiscrimination duty is triggered only when the individual to be transferred has not been stabilized when the transfer request was made." *Id*. at 697.

Under EMTALA, "stabilization requires only that the physician determine, within a reasonable degree of medical probability, that the individual's emergency condition *is not likely to deteriorate materially during the transfer*." *Bergwall,* 243 F.Supp.2d at 374 (emphasis added).

It is undisputed in this case that Mr. Mullins' condition was stabilized.   Dr. Leonard, the treating physician, testified under oath in Affidavit and in his deposition, that Mr. Mullins injury was clinically stable. *See* Exhibit 5 &12.   Furthermore, Mr. Mullins' condition was clearly stable, given that Dr. Leonard contacted Union Memorial Hospital to request a transfer of the patient from Suburban.   Meaning to say, actions speak louder than words:  consistent with

---

(g) Nondiscrimination
    A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

EMTALA provisions, Dr. Leonard would not have requested / considered a transfer, had he not believed that Mr. Mullins condition was *not likely to deteriorate materially during the transfer*.

As the *Bergwall* Court indicated, EMTALA only requires that no material deterioration is likely to result or occur during the transfer for the patient to be considered "stable." *See Bergwall*, 243 F.Supp. at 375. "Once a physician determines that a patient's condition is stable, the patient may be lawfully transferred without following EMTALA's provisions." *Id*. at 376-77 ((citing *Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Circ. 1999)(noting that EMTALA's transfer provisions only apply if patient has an emergency medical condition which has not been stabilized)); *see also Green v. Touro Infirmary*, 992 F.2d 537, 539 (5th Cir. 1993)(holding that under EMTALA, the hospital's responsibility ends when it stabilizes the patient's condition). Because the *Bergwall* Court found that the patient was appropriately stabilized, it did not need to consider whether the defendant hospital properly complied with the transfer provisions of the Act, because "EMTALA claims do not lie here." *Id*. at 377.   Likewise, in the case *sub judice*, the evidence adduced in discovery (contemporaneous medical records, Affidavits, and deposition testimony) makes clear that Mr. Mullins' condition was "stable" under EMTALA, which renders all subsequent conduct (by either Suburban or Union Memorial) to fall outside of the EMTALA provisions.   Accordingly, Defendant is entitled to summary judgment as a matter of law.

> ## 2. EMTALA is Inapplicable Given that Union Memorial Hospital did Not have a "Specialized Capability" Above and Beyond the Specialists on Staff at Suburban Hospital; Furthermore, Plaintiff Failed to Establish that Union Memorial Hospital Possessed the Capacity to Treat Mr. Mullins.

Under EMTALA's "nondiscrimination" or "reverse dumping" provision, a hospital is required to accept an "appropriate transfer" (of an individual who has not been stabilized), when it possesses specialized capabilities or facilities and has the capacity to treat the individual.  *See*

12

*St. Anthony Hosp. v. U.S. Dept. of Health and Human Services*, 309 F.3d 680, 693 (10th Cir.

2002).  The EMTALA "reverse dumping" provision does not apply to this case for two reasons:

(a) Union Memorial Hospital did not have "specialized capabilities" relative to those of the

requesting institution; and (b) Plaintiff has adduced no evidence that Union Memorial had the

capacity to treat Mr. Mullins at the time of the request.

     The 10th Circuit Court of Appeals considered the applicability of the nondiscrimination

provision in *St. Anthony Hosp. v. U.S. Dept. of Health and Human Services*, 309 F.3d 680 (10th

Cir. 2002).  In *St. Anthony Hosp.*, a 65 year old male involved in an automobile accident

presented to a small hospital 35 miles outside Oklahoma City "that lacked the ability to perform

many complex medical procedures." *Id.* at 687.   The rural hospital requested a transfer to St.

Anthony Hospital, but was denied. *Id.*   An administrative law judge found that St. Anthony

possessed specialized capabilities and facilities to treat the patient. *Id.* at 690.   In so ruling, the

court explained that the "specialized capabilities" prong relates to the particulars of the potential

transfer, *i.e.,* did the institution from whom acceptance was sought possess capabilities to treat

and address the patient's status that were not available at the requesting institution. *See St.

Anthony Hosp.*, 309 F.3d at 701.  "Congress intended [specialized capabilities] to encompass

those capabilities and facilities which enable a hospital to offer ***specialized care that is <u>not</u>

offered*** by hospitals that are less well-endowed," *Id.* (emphasis added).

     In the case *sub judice,* there is no dispute that Suburban Hospital, (like Union Memorial)

had both orthopedic surgeons and hand specialists available to evaluate and treat the patient.

First, in response to subpoena, Suburban Hospital produced its on-call schedule for April 2014,

which revealed that it scheduled both on-call orthopedic surgeons and on-call hand specialists.

*See* Exhibit 9.   Second, the medical records reveal that Dr. Leonard contacted Dr. Feledy (hand

specialist), Dr. Joe Michaels (hand specialist), Dr. Mahidhar Durbhakula (hand specialist) and Dr. Robert Karp (Chief of Hand Surgery) before learning that Dr. Gasho was *en route* to see the patient. *See* Exhibits 4 & 5. Third, the medical records also reveal that Dr. Karp called Dr. Leonard back regarding Mr. Mullins, but Dr. Leonard advised him that his services were not needed, given Dr. Gasho's impending arrival (clearly evidencing that Suburban possessed hand specialist capabilities at the time in question). *Id.* Fourth, Dr. Leonard affirmed, under oath, the presence of and his communications with all of these in-house specialists at Suburban. *See* Exhibit 5. Fifth, Dr. Feledy confirmed, under oath, that he was the first on-call hand specialist for Suburban Hospital on April 15, 2014, and that Suburban had another on-call hand specialist. *See* Exhibit 6. Sixth, the medical records confirm at that Dr. Gasho, the on-call orthopedic surgeon, promptly arrived in the Emergency Department or evaluate the patient. *See* Exhibit 4 & 5. Seventh, Dr. Elliott and Dr. Zimmerman affirmed, under oath, their own knowledge and awareness of the capabilities possessed by Suburban Hospital as a Level II trauma center in the State. *See* Exhibits 7 & 8. Eighth, after evaluating the patient, Dr. Gasho advised Mr. Mullins that he could address the injury surgically. *See* Exhibits 2 & 3. Ninth, Suburban had an operating room and trained staff to permit the surgical procedure to be undertaken on April 15, 2014 at 7:30 p.m. *See* Exhibit 4. In conclusion, it is beyond dispute that Suburban Hospital possessed the same capabilities, in terms of specialty care for hand injuries, as Union Memorial Hospital. On this basis alone, it is clear that there exists no material dispute of fact and Defendant is entitled to summary judgment as a matter of law.

In considering the second prong of the "reverse dumping" provision, *i.e.,* the "capacity to treat," Plaintiff has adduced no evidence, whatsoever, that Union Memorial Hospital had the capacity to treat Mr. Mullins in the mid-afternoon on April 15, 2014. The Tenth Circuit in *St.*

*Anthony's Hosp., supra*, similarly outlined the type of evidence that was necessary to support a

conclusion that the institution had the "capacity to treat" rendering it subject to EMTALA.   *See*

*St. Anthony's Hosp.*, 309 F.3d at 702.   This prong refers to the ability of the hospital to

accommodate the patient requesting the treatment.   The plaintiff must adduce "substantial

evidence" of the capacity to treat, including that the institution had qualified staff available to

evaluate and treat the patient, the necessary beds to accommodate the patient, OR time or space,

etc. *Id*. at 701-02.   In the case at hand, Mr. Mullins has adduced absolutely no evidence,

whatsoever, that Union Memorial Hospital's Curtis Hand Center possessed the necessary

resources to fulfill the "capacity to treat" prong.   Meanwhile, Union Memorial Hospital

produced three Affidavits which attested to the fact that the on-call Fellow and on-call attending

hand specialist were involved with a complex emergency surgery for a multi-digit amputation

which kept them in the Operating Room until 0139 the following day.   *See* Ex. 7, Ex. 8, Ex. 11.

At a minimum, this evidence counters any (unsupported) claim by Mr. Mullins that Defendant

possessed the capacity to treat, per the EMTALA provision.   On this basis alone, it is clear that

there exists no material dispute of fact and Defendant is entitled to summary judgment as a

matter of law.

Considered together, however, it is clear that Plaintiff cannot satisfy the requirements of

the nondiscrimination / 'reverse dumping' provision in EMTALA, and this Defendant is entitled

to summary judgment as a matter of law.

**3.   EMTALA is Inapplicable Given that Union Memorial Hospital did Not Refuse
to Treat Mr. Mullins**.

Finally, in addition to the myriad of bases upon which this Court may grant summary

judgment in Defendant's favor, Defendant adds the following:   Union Memorial Hospital did

**not** deny the transfer request of Mr. Mullins, as is evidenced by the following:   First, by

15

properly notarized and executed Affidavit, Dr. Elliott, the Fellow at Union Memorial Hospital's Curtis Hand Center, avowed:  "I promptly telephoned Suburban's Emergency Department and spoke with Dr. Leonard; I advised him that Dr. Zimmerman would be happy to discuss treatment options regarding the patient (including the possibility of transfer) when the patient had been evaluated by their internal orthopedic surgeon / hand surgeon."  *See* Exhibit 7.

Second, Dr. Zimmerman, the attending physician on-call at Union Memorial Hospital's Curtis Hand Center also confirmed the following in his properly notarized and executed Affidavit: "I advised Dr. Elliott to ask the Suburban Emergency Department staff to have its own on-call orthopedic surgeon promptly evaluate the patient, after which time, he/should could consult with the Curtis National Hand and an educated decision could be made about feasible treatment alternatives for Mr. Mullins, including but not limited to a telephonic consultation, discharge with a clinic appointment the following day, conducting a definitive procedure at Suburban and/or transfer to the Curtis National Hand Center.  The Curtis National Hand Center **never declined Mr. Mullins as a patient**; rather, I simply requested that the on-call orthopedic physician at a known Level II trauma center call to consult with me after his/her own on-site evaluation of the patient."  *See* Exhibit 8 (emphasis added).

Third, the contemporaneous call logs from Union Memorial Hospital confirm that Mr. Mullins was not declined as a patient; rather, a consultation was offered.  *See* Exhibit 10.

Fourth, the corporate designee for Union Memorial Hospital affirmed the meaning of the contemporaneous call logs, to wit:   "the Curtis Hand Center call logs from April 15, 2014 confirm that the Curtis Hand Center **did not decline any request** by Suburban Hospital to transfer the patient; to the contrary, Mr. Mullin's case is listed as a 'consult.'  The Curtis Hand Center worksheet relating to Mr. Mullins states 'consult not accepted,' which indicates that

16

Suburban elected not to consult with Curtis Hand Center regarding this patient, or at a minimum, no further communication or requests were received from Suburban regarding Mr. Mullins." *See* Exhibit 11 (emphasis added).

Thus, it is clear that Union Memorial did not decline Mr. Mullins as a patient; rather, Union Memorial merely sought an in-house assessment by orthopedic surgeon or hand specialist at Suburban, so that this physician could then communicate the patient's condition and needs to Union Memorial in a more comprehensive manner than could an ED provider.[7]   In this manner, an appropriate determination about feasible treatment alternatives for Mr. Mullins, including but not limited to a telephonic consultation by Curtis Hand Center, discharge from Suburban with a clinic appointment at Curtis the following day, consultation regarding conducting a definitive procedure at Suburban and/or a transfer to the Curtis National Hand Center.  *See* Exhibits 7 & 8. These types of assessments are routinely requested when the transferring hospitals have the same capabilities as the Curtis Hand Center, and for good reason.   The Curtis Hand Center is not an unlimited resource; it had one on-call attending physician on April 15, 2014.   As Dr. Zimmerman noted, on that very afternoon, he was called into an emergency multi-digit amputation case that required him to be in surgery for several hours, until 0139 the following morning.  *See* Exhibit 8.  Meaning to say, had Union Memorial blindly accepted the transfer of Mr. Mullins, his treatment would have been delayed until the morning hours of April 16th, given that the multi-digit amputation case would have been triaged as a higher priority than Mr. Mullins.  (One can imagine that Mr. Mullins would then be suing Union Memorial Hospital for accepting a patient without the capacity to treat).   This is precisely why in-house evaluations by

---

[7]   Dr. Leonard is an emergency medicine physician, and while he is quite competent at the practice of emergency medicine, Dr. Leonard readily acknowledged that he would defer to an orthopedic surgeon / hand specialist as to the type of treatment Mr. Mullins required, the scope of treatment, and when that treatment needed to be initiated for the best outcome.   *See* Exhibit12.

17

specialists are requested when those specialists are known to be available at the requesting institution.

In summary, given the overwhelming evidence that Union Memorial Hospital did not decline to accept Mr. Mullins as a patient, EMTALA is neither applicable nor implicated the factual scenario at hand.   Summary judgment in Defendant's favor is warranted as a matter of law.

**D.  PLAINTIFF HAS FAILED TO ADDUCE EVIDENCE THAT ANY ALLEGED EMTALA VIOLATIONS CAUSED INJURY**

Notwithstanding the clear grounds for summary judgment in Defendant's favor (above), Defendant also maintains that Plaintiff has adduced no evidence that his outcome would have been any different had the surgery been performed by Dr. Zimmerman at Union Memorial Hospital vice Dr. Gasho at Suburban Hospital.   Plaintiff must not only prove the hospital did not follow the exact statutory requirements of EMTALA; he must also establish that the failure caused injury.    Only one expert has physically examined Mr. Mullins in this case: Dr. Barth. Dr. Barth concluded, based upon his examination of Mr. Mullins and assessment of the functionality of his finger, that Mr. Mullins' condition would not have been dramatically different had a different technique been utilized during the surgical procedure.  *See* Ex. 13.

For these reasons, there is insufficient evidence to generate a material dispute of fact as to causation, and summary judgment in Defendant's favor is warranted as a matter of law.

**III.    CONCLUSION**

WHEREFORE, for the aforementioned reasons, Defendant MedStar Union Memorial Hospital respectfully requests that this Honorable Court grant Defendant's Motion for Summary Judgment.

18

Respectfully submitted,


   *Michelle R. Mitchell*
 Daniel C. Costello, Esquire
Maryland Federal Bar No.: 08010
*dcc@wlekn.com*
Michelle R. Mitchell, Esquire
Maryland Federal Bar No.: 26703
*mrm@wlekn.com*
Wharton, Levin, Ehrmantraut & Klein, P.A.
104 West Street
Annapolis, MD 21404-0551
(410) 263-5900 (ph)
(410) 280-2230 (fax)
*Counsel for Defendant*
*The Union Memorial Hospital, Inc.*

**Certificate of Service**

I HEREBY CERTIFY that on this 16th day of March, 2018 the foregoing was served, electronically and via first class mail, postage prepaid, upon:

Jerry W. Mullins
7031 Southerland Circle
Salem, VA 24153
*Pro se Plaintiff*


 /s/ Michelle R. Mitchell
Michelle R. Mitchell, Esquire

20